# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| STUDIO 417, INC.,<br>GRAND STREET DINING, LLC,<br>GSD LENEXA, LLC,<br>TREZOMARE OPERATING COMPANY,<br>LLC, and<br>V's RESTAURANT, INC.,<br>Each individually and on behalf of all<br>others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>THE CINCINNATI INSURANCE<br>COMPANY,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 6:20-cv-03127-SRB |

## PLAINTIFFS' SUGGESTIONS IN OPPOSITION TO DEFENDANT
## THE CINCINNATI INSURANCE COMPANY'S MOTION TO DISMISS

Brandon J.B. Boulware
Jeremy M. Suhr
Boulware Law LLC
1600 Genessee Street
Suite 416
Kansas City, MO 64102
Tele: (816) 492-2826
brandon@boulware-law.com
jeremy@boulware-law.com

Todd Johnson
Votava Nantz & Johnson, LLC
9237 Ward Parkway, Suite 240
Kansas City, MO 64114
Tele: (816) 895-8800
tjohnson@vnjlaw.com

Thomas A. Rottinghaus
Tyler W. Hudson
Jack T. Hyde
Wagstaff & Cartmell LLP
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
(816) 701-1100 (telephone)
thudson@wcllp.com
trottinghaus@wcllp.com
jhyde@wcllp.com

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................ 1

II. LEGAL STANDARDS ........................................................................................ 3

III. ARGUMENT .................................................................................................... 4

   A. Plaintiffs plausibly allege that they sustained Physical Loss or Damage............................ 4

     1. The policy language at issue is ambiguous .............................................................. 4

     2. Cincinnati's policy language does not require physical alteration to constitute physical loss or physical damage to Plaintiffs' property .................................... 6

     3. Federal courts applying Missouri substantive law have not required physical alteration of property to find physical loss or damage ...................................... 11

     4. Even *temporary* contamination or *suspected* contamination can cause "physical loss or damage" ................................................................................... 15

     5. The development of an industry standard exclusion language related to disease-causing bacterial or viral infections shows that Cincinnati knew or should have known that its policies provided coverage in situations where physical loss occurred without physical alteration .......................................... 16

   B. Civil Authority coverage is plausibly alleged ..................................................... 16

   C. Ingress and Egress coverage is plausibly alleged ............................................... 20

   D. Dependent Property Coverage is plausibly alleged.............................................. 22

   E. Sue and Labor Coverage is plausibly alleged .................................................... 23

IV. CONCLUSION................................................................................................. 24

# TABLE OF AUTHORITIES

## CASES

*Advance Cable Co., LLC v. Cincinnati Ins. Co.*,
  No. 13-CV-229-WMC, 2014 WL 975580 (W.D. Wis. Mar. 12, 2014) ........................... 3, 9, 10

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..................................................................................................... 3, 4

*Assicurazioni Generali S.P.A. v. Black & Veatch Corp.*,
  362 F.3d 1108 (8th Cir. 2004) ............................................................................................. 24

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................................................ 4

*Braden v. Wal-Mart Stores, Inc.*,
  588 F.3d 585 (8th Cir. 2009) .................................................................................................. 4

*Capitol Indem. Corp. v. 1405 Assocs., Inc.*,
  340 F.3d 547 (8th Cir. 2003) .................................................................................................. 4

*Cincinnati Ins. Co. v. German St. Vincent Orphan Ass'n, Inc.*,
  54 S.W.3d 661 (Mo. App. 2001) ................................................................................ 5, 6, 10, 12

*Cooper & Olive Indus. v. Travelers Indem. Co.*,
  No. C-01-2400, 2002 WL 32775680 (N.D. Cal. Nov. 4, 2002) ............................................. 14

*Crestview Country Club, Inc. v. St. Paul Guardian Ins. Co.*,
  321 F. Supp. 2d 260 (D. Mass. 2004) .................................................................................. 10

*Eckert v. Titan Tire Corp.*,
  514 F.3d 801 (8th Cir. 2008) .................................................................................................. 4

*Fountain Powerboat Indus., Inc. v. Reliance Ins. Co.*,
  119 F. Supp. 2d 552 (E.D.N.C. 2000) ................................................................................. 21

*Friends of Danny DeVito v. Wolf*,
  227 A.3d 872 (Pa. 2020) ....................................................................................................... 15

*General Mills, Inc. v. Gold Medal Ins. Co*,
  622 N.W.2d 147 (Minn. App. 2001) ...................................................................................... 8

*Great Plains Ventures, Inc. v. Liberty Mut. Fire Ins. Co.*,
  161 F. Supp. 3d 970 (D. Kan. 2016) ...................................................................................... 9

*Gregory Packaging, Inc. v. Travelers Prop. Cas.*,
  No. 2:12-cv-04418, 2014 WL 6675934 (D. N.J. Nov. 25, 2014) ........................................... 15

Case 6:20-cv-03127-SRB   Document 31   Filed 07/20/20   Page 3 of 31

*Hampton Foods, Inc. v. Aetna Cas. & Sur. Co.*,
    787 F.2d 349 (8th Cir. 1986) ......................................................... 3, 5, 11

*Heshion Motors v. Western Int'l Hotels*,
    600 S.W.2d 526 (Mo. App. 1980) ......................................................... 12

*Hughes v. Potomac Ins. Co.*,
    18 Cal. Rptr. 650 (Cal. Dist. Ct. App. 1962) .......................................... 14

*Jones v. Mid-Century Ins. Co.*,
    287 S.W.3d 687 (Mo. banc 2009) ........................................................... 5

*Manpower Inc. v. Ins. Co. of the State of Penn.*,
    No. 08C0085, 2009 WL 3738099 (E.D. Wis. Nov. 3, 2009) ................................ 7, 10

*Matzner v. Seaco Ins. Co.*,
    No. 96-0498-B, 1998 WL 566658 (Mass. Super. Ct. August 12, 1998) ................... 13

*Mehl v. Travelers Home & Marine Ins. Co.*,
    No. 4:16-cv-01325 CDP, 2018 U.S. Dist. LEXIS 74552 (E. D. Mo. May 2, 2018)......... 6, 7, 12

*Motorist Mut. Ins Co. v. Hardinger*,
    131 F. Appx. 823 (3d Cir. 2005) .......................................................... 12

*Murray v. State Farm Fire & Cas. Co.*,
    509 S.E.2d 1 (W. Va. 1998) ................................................................. 7

*Pentair, Inc. v. Am. Guarantee & Liab. Ins. Co*,
    400 F.3d 613 (8th Cir. 2005) ................................................................ 9

*Peters v. Employers Mut. Cas. Co.*,
    853 S.W.2d 300 (Mo. banc 1993) ............................................................ 4

*Port Auth. of New York & New Jersey v. Affiliated FM Ins. Co.*,
    311 F.3d 226 (3d Cir.2002) ............................................................. 2, 7, 13

*Prudential Prop. & Cas. Co. v. Lillard–Roberts*,
    CV–01–1362–ST, 2002 WL 31495830 (D. Or. June 18, 2002) .......................... 7, 13, 14

*Secura Ins. v. Horizon Plumbing, Inc.*,
    670 F.3d 857 (8th Cir. 2012) .............................................................. 11

*Sentinel Mgmt. Co. v. New Hampshire Ins. Co.*,
    563 N.W.2d 296 (Minn. App. 1997) ...................................................... 8, 13

*Source Food Tech., Inc. v. U.S. Fid. & Guar. Co.*,
    465 F.3d 834 (8th Cir. 2006) ........................................................ 5, 7, 8, 9

iii

*Southern Hospitality, Inc. v. Zurich Am. Ins. Co.*,
    393 F.3d 1137 (10th Cir. 2004) ................................................................. 18

*TMC Stores, Inc. v. Federated Mut. Ins. Co.*,
    2005 WL 1331700 (Minn. Ct. App. June 7, 2005) ....................................... 18, 19, 20

*Travco Ins. Co. v. Ward*,
    715 F. Supp. 2d 699 (E.D. Va. 2010) ....................................................... 13

*Velder v. Cornerstone Nat'l Ins. Co.*,
    243 S.W3d 512 (Mo. App. 2008) ............................................................. 6

*W. Fire Ins. Co. v. First Presbyterian Church*,
    437 P.2d 52 (Colo. 1968) .......................................................................... 7, 12

*Zink v. Lombardi*,
    783 F.3d 1089 (8th Cir. 2015) ................................................................... 3

## **RULES**

Fed. R. Civ. P. 12(b)(6) .............................................................................. 1, 3

iv

# I.    <u>INTRODUCTION</u>

Plaintiffs Studio 417, Inc., Grand Street Dining, LLC and GSD Lenexa, LLC (collectively "**Grand Street**"), Trezomare Operating Co., and V's Restaurant, Inc. are businesses that successfully operated in Springfield (Studio 417) and Kansas City (the other three) until March 2020. Around that time, these four businesses suffered direct physical loss of the use of their property as a result of the global Coronavirus pandemic (COVID-19) and government closure orders that made their property uninhabitable and/or unusable for its intended business operation. Fortunately, each business purchased "all risks" commercial insurance coverage and paid premiums to Defendant, The Cincinnati Insurance Company ("**Cincinnati**"), to be protected from this type of direct physical loss that resulted in lost income and other damage.[1] Each business submitted a valid insurance claim to Cincinnati for covered losses. Cincinnati rejected each of the claims in a form rejection letter. This class action lawsuit followed.

Cincinnati's Motion to Dismiss argues that Plaintiffs' Amended Complaint ("**Complaint**") fails to state any viable claim and should be dismissed under Rule 12(b)(6). See Doc. 21 ("**Motion**"). Cincinnati asserts that the insurance policies here are property insurance policies that unambiguously state that they provide coverage only for physical damage to property caused by events like a fire or storm. Motion at 1-2.

Cincinnati's argument is baseless. It ignores the plain language of the policies, disregards adverse case law, including Eighth Circuit precedent applying Missouri law, and discounts the expectations of businesses who paid premiums to Cincinnati for "all risks" commercial insurance coverage. The crux of Cincinnati's argument, which is primarily supported by cases decided at the

---

[1] Like other insurers, Cincinnati offers insurance policies that contain "virus exclusion" language that, according to Cincinnati, expressly excludes coverage for losses caused by a virus. Plaintiffs' policies, however, do not contain this virus exclusion.

1

*summary-judgment stage*, is that the policies cover only income losses tied to physical damage to property. Cincinnati focuses on certain language in the policies that the insured suffer "physical loss" and then contends that this phrase means that an insured must show that the property sustained an "actual, tangible, permanent, physical alteration" to establish any insurance coverage under the policies. Motion at 13, 16. If Cincinnati wanted to sell an insurance policy to businesses with such narrow coverage, then it should have drafted the policy to clearly state that. It did not.

The key phrases in the policy are "physical loss" *and* "physical damage."[2] The policies cover *both* types of losses. Cincinnati drafted these policies and should be able to point the Court to a section in the policies that defines these terms. But there is no such section because Cincinnati did not define the terms. Cincinnati's Motion carefully avoids using these two different phrases at the same time because doing so would make it obvious that Cincinnati's self-serving, newly created definition of "physical loss" is synonymous with the definition of "physical damage," and that interpretation cannot be correct because Cincinnati drafted the policy and chose to use different phrases that must therefore have different meanings. In short, the policy's coverage is not as narrow as Cincinnati would have this Court believe. Numerous courts have held that loss of use of property constitutes "physical loss." *See, e.g., Port Auth. of New York & New Jersey v. Affiliated FM Ins. Co.*, 311 F.3d 226, 236 (3d Cir.2002) ("When the presence of large quantities of asbestos in the air of a building is such as to make the structure uninhabitable and unusable, then there has been a distinct [physical] loss to its owner."). Indeed, another case analyzing very similar language *in a Cincinnati insurance policy* noted "that where [an] insurance policy explicitly covered physical loss *and* physical damage, 'direct physical loss' must mean something other than 'direct physical damage,' since otherwise [the] policy language would be rendered superfluous." *Advance*

_____

[2] *See* Motion at 9 (noting the policies define "loss" "as physical loss or damage").

*Cable Co., LLC v. Cincinnati Ins. Co.*, No. 13-CV-229-WMC, 2014 WL 975580, at *10 (W.D. Wis. Mar. 12, 2014), *aff'd*, 788 F.3d 743 (7th Cir. 2015) (emphasis in original, quotation omitted).

To present even a colorable argument for dismissal as a matter of law at this stage, Cincinnati must show that under Missouri law the disputed language in the insurance policies — "physical loss" — is unambiguous and synonymous with physical *damage*.[3] It cannot do so. In fact, the Eighth Circuit, interpreting Missouri law, rejected an insurance company's argument for **summary judgment** in an insurance coverage dispute involving a commercial liability policy that did not define "physical loss," finding the phrase was ambiguous. *Hampton Foods, Inc. v. Aetna Cas. & Sur. Co.*, 787 F.2d 349, 351-52 (8th Cir. 1986). This Court should reach the same conclusion here.

Cincinnati's other arguments for dismissal rest on first establishing as a matter of law that Plaintiffs have suffered no physical loss or physical damage. Because Cincinnati has failed to show that "physical loss" is a defined term or unambiguously has the narrow meaning that Cincinnati contends, and because there are numerous fact questions that exist in determining whether physical loss or physical damage has occurred, none of Cincinnati's other arguments for dismissal are valid for the reasons explained below. This Court should deny Cincinnati's motion to dismiss entirely.

## II.  LEGAL STANDARDS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Zink v. Lombardi*, 783 F.3d 1089, 1098 (8th Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A claim has facial plausibility when its allegations rise above the "speculative" or "conceivable," *Bell Atlantic*

---

[3] Of course, even if Cincinnati were able to show the policy language is unambiguous, this Court would still be left to consider the factual question of whether there was physical loss or physical damage to property, which is a fact issue not appropriate for a Rule 12(b)(6) motion.

3

*Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007), and where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Such a complaint will be liberally construed in the light most favorable to the plaintiff. *Eckert v. Titan Tire Corp.*, 514 F.3d 801, 806 (8th Cir. 2008). "Finally, the complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible" *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009).

III.   **ARGUMENT**

**A.  Plaintiffs plausibly allege that they sustained Physical Loss or Damage**

Cincinnati acknowledges that its policies[4] supply coverage that Plaintiffs seek to enforce. Motion at 8. But, relying primarily on three cases involving ***summary judgment*** motions, Motion at 13–17, Cincinnati argues that Plaintiffs have not plausibly alleged that they sustained "direct physical loss" to their property. *Id*. at 13. This argument fails for several reasons.[5]

**1.  The policy language at issue is ambiguous**

While interpreting the meaning of an insurance policy is a question of law, *Capitol Indem. Corp. v. 1405 Assocs., Inc*., 340 F.3d 547 (8th Cir. 2003), when a policy's language is ambiguous it will be construed against the insurer, *Peters v. Employers Mut. Cas. Co*., 853 S.W.2d 300, 301-302 (Mo. banc 1993). "Language is ambiguous if it is reasonably open to different constructions."

---

[4] Although there are four separate policies issued to the Plaintiffs, Cincinnati correctly notes that each policy contains identical pertinent language. Motion at 8, n.11. Like Cincinnati, Plaintiffs refer to the policies collectively as "policy" or "policies" in these Suggestions and cite to the copy of the Studio 417 policy attached to the initial Complaint (Doc. 1-1).

[5] Even assuming Plaintiffs' property suffered no direct physical loss, Cincinnati's Motion still fails because factual disputes remain as to whether any other property has suffered a direct physical loss that would trigger the Civil Authority coverage provided by the policies. *See* Section IV.B.

4

*Cincinnati Ins. Co. v. German St. Vincent Orphan Ass'n, Inc.*, 54 S.W.3d 661, 668 (Mo. App. 2001) (reversing order granting summary judgment to Cincinnati because its policy was ambiguous and holding that coverage existed under Cincinnati's policy). An ambiguity exists in an insurance policy when there is duplicity, indistinctness, or uncertainty in the meaning of the words used in the policy. *Peters*, 853 S.W.2d at 302. Courts also emphasize that insurance policies should be given a reasonable construction and interpretation so as to afford coverage rather than to defeat coverage. *See Cincinnati Ins. Co.*, 54 S.W.3d at 667. If a policy's language is deemed to be unambiguous, the Court uses the meaning that would be attached by an ordinary person. *Jones v. Mid-Century Ins. Co*., 287 S.W.3d 687, 690 (Mo. banc 2009).

Here, Cincinnati could have, but did not, define the phrases "direct physical loss," "physical loss," and "direct physical damage" anywhere in its policies. The Eighth Circuit, applying ***Missouri*** law, previously held that the phrase "direct physical loss" in an insurance policy is ambiguous and, accordingly, must be construed against the insurer. *Hampton Foods, Inc. v. Aetna Cas. & Sur. Co.*, 787 F.2d 349, 351-52 (8th Cir. 1986). Cincinnati fails even to mention this relevant and controlling Eighth Circuit authority. In *Hampton*, the Eighth Circuit further found that the "commonsense meaning of the policy provision is that any loss or damage due to the ***danger*** of direct physical loss is covered." *Id*. at 352 (internal quotations omitted) (emphasis in original). Having failed to cite let alone attempt to distinguish *Hampton*, Cincinnati relies on an Eighth Circuit case applying Minnesota law (and involving a summary judgment motion). Motion at 13 (citing *Source Food Tech., Inc. v. U.S. Fid. & Guar. Co.*, 465 F.3d 834 (8th Cir. 2006)).

Cincinnati's arguments stem from a premise that "physical loss" and "physical damage" require ***alteration*** of the insured property, but as argued below that interpretation is unreasonable and contradicted by case law. Plaintiffs' interpretation is reasonable, but even giving Cincinnati

5

the benefit of the doubt that its interpretation is also reasonable, then it remains true that Plaintiffs and Cincinnati have alternative interpretations of the policy language. Where an insurance policy can be construed in two reasonable ways, it will be interpreted against the party that drafted it. *See Velder v. Cornerstone Nat'l Ins. Co*., 243 S.W3d 512, 517 (Mo. App. 2008). Therefore, even if Cincinnati's interpretation of the policy language is reasonable, if Plaintiffs' interpretation of the policies is ***also*** reasonable (which it is), then the policy is ambiguous. *Id*. And under Missouri law, that policy language must be resolved in favor of Plaintiffs. *Id.*

### 2. Cincinnati's policy language does not require physical alteration to constitute physical loss or physical damage to Plaintiffs' property

Although Cincinnati argues that its policies require physical ***alteration*** for there to be "direct physical loss" to Plaintiffs' property, Motion at 13, Cincinnati is unable to point to ***any*** language in its policies articulating the necessity of "alteration" of property. While "loss" is defined in the policies as "physical loss" ***or*** "physical damage," those terms are not defined anywhere in the policies. Despite Cincinnati's emphasis of a purported requirement of "alteration" for there to be a "physical loss," the policy's use of the disjunctive "or" between the terms "physical loss" and "physical damage" necessarily means that either a "loss" or "damage" is required, and that "loss" is distinct from "damage." *See* Doc. 1-1 at 57. Cincinnati chose not to include any additional modifiers to these terms, just as it chose not to define these terms with specificity. The policies at issue are thus ambiguous as to what constitutes "physical loss" or "physical damage." *See Mehl v. Travelers Home & Marine Ins. Co.,* No. 4:16-cv-01325 CDP, 2018 U.S. Dist. LEXIS 74552, at *2 (E. D. Mo. May 2, 2018) (citing *Cincinnati Ins. Co. v . German St. Vincent Orphan Ass'n, Inc*., 54 S.W.3d 661, 668 (Mo. App. 2001)).[6] In *Mehl*, the court determined a policy that did not define the phrase "direct physical loss" was ambiguous, should

---

[6] As the *Mehl* opinion does not appear on Westlaw, Plaintiffs attach a copy hereto as **Exhibit 1**.

6

not be interpreted as requiring "actual physical damage," and denied the insurer's motion for summary judgment. **Ex. 1**.

Similar to *Mehl*, numerous other courts have held that loss of use of property constitutes "physical loss." *See, e.g., Port Auth. of New York & New Jersey v. Affiliated FM Ins. Co.*, 311 F.3d 226, 236 (3d Cir.2002) ("When the presence of large quantities of asbestos in the air of a building is such as to make the structure uninhabitable and unusable, then there has been a distinct [physical] loss to its owner."); *Manpower Inc. v. Ins. Co. of the State of Penn.*, No. 08C0085, 2009 WL 3738099, at *5 (E.D. Wis. Nov. 3, 2009) (insured suffered a "direct physical loss" covered by all-risk insurance policy when it was forced to evacuate insured premises for safety reasons, even though the premises themselves were not physically damaged); *Prudential Prop. & Cas. Co. v. Lillard–Roberts,* CV–01–1362–ST, 2002 WL 31495830, at *9 (D. Or. June 18, 2002) (holding there may be a "direct physical loss" when property is "rendered uninhabitable by mold"); *Murray v. State Farm Fire & Cas. Co.,* 509 S.E.2d 1, 16–17 (W. Va. 1998) (policyholders suffered "direct physical loss" when their homes were rendered uninhabitable due to threat of rockfall); *W. Fire Ins. Co. v. First Presbyterian Church*, 437 P.2d 52, 55 (Colo. 1968) (policyholder suffered "direct physical loss" when "the accumulation of gasoline around and under the [building caused] the premises to become so infiltrated and saturated as to be uninhabitable, making further use of the building highly dangerous").

Cincinnati skips past *Mehl* and the other above-cited cases, relying instead on distinguishable, non-binding authority to argue that "direct physical loss requires actual, tangible, permanent, physical alteration of property." Mot. at 13, 16. Cincinnati first points to *Source Food Tech., Inc. v. U.S. Fid. & Guar. Co.*, 465 F.3d 834 (8th Cir. 2006), which arose out of a disruption in the supply of an ingredient due to a governmental embargo on Canadian beef. The plaintiff lost

7

access to its normal supply of beef product when its supplier's truck could not cross the border into the United States. Although the plaintiff was able to find a new supplier of product, the plaintiff argued the disruption of its usual supply was a "direct physical loss" to its property and sued its insurer. *Id*. at 837. The trial court granted summary judgment for the insurer, and the Eighth Circuit affirmed, finding that "direct physical loss" did not extend to the insured's uncontaminated product stuck at the border.

*Source Food* is distinguishable factually and legally. For starters, the case was decided on a summary judgment record applying Minnesota — not Missouri — law. Further, and contrary to the Cincinnati Policy here, the policy language at issue was limited to "just 'direct physical loss'" and did not cover "all loss or **damage**." *Id.* at 837 (emphasis added). Indeed, the *Source Food* Court highlighted this difference to distinguish the case from an earlier case decided by the Minnesota Court of Appeals that found "direct physical loss" can exist ***without*** actual destruction or any structural damage to property. *Id*. at 837.[7] *See also Sentinel Mgmt. Co. v. New Hampshire Ins. Co*., 563 N.W.2d 296, 300 (Minn. App. 1997) ("Direct physical loss may exist in the absence of structural damage to the insured property…"). *Source Food* — which shares essentially no

---

[7] In *General Mills, Inc. v. Gold Medal Ins. Co*, 622 N.W.2d 147 (Minn. App. 2001), the Minnesota Court of Appeals found that there was direct physical loss where cereal was not able to be sold because of legal regulations. The court found that "direct physical loss can exist without actual destruction of property or structural damage to property," as direct physical loss is present if the function of the property is seriously impaired or destroyed. *Id* at 152. The court found that "the function of the food products [at issue] was not only to be sold, but to be sold with an assurance that they meet certain regulatory standards." *Id*. When the food distributor "is unable to lawfully distribute its products because of FDA regulations, that function is seriously impaired." *Id.* The court thus held that because the product at issue could not be legally used in the food distributor's business, there was an impairment of function and value constituting direct physical loss and damage. The court did not rely on whether the food product had been contaminated; rather, the issue was that imposition of government regulations rendered the product unsellable. Whether the oats could be safely consumed was not the issue; they could not be used in the plaintiff's business. *Id*. And on this basis the court found a loss of function that constituted direct physical loss. *Id.*

8

similarities with the case before this Court — cannot credibly be interpreted to hold that "direct physical loss requires actual, tangible, permanent, physical alteration of property," as Cincinnati claims. Mot. at 13, 16.

Cincinnati also relies on *Pentair, Inc. v. Am. Guarantee & Liab. Ins. Co*, 400 F.3d 613 (8th Cir. 2005), which is another summary judgment-stage case decided under Minnesota law. The principal issue in *Pentair* was the scope of ***direct*** physical loss or damage within the meaning of the insurance policy, where an earthquake in Taiwan shut down an electrical substation that supplied power to Taiwanese factories that, in turn, supplied product to Pentair (the insured). (Cincinnati makes no such scope argument here.) The trial court concluded that earthquake damage to a non-insured electrical substation was too far removed to be covered under the "direct physical loss or damage" provision of the insurance policy. Affirming, the Eighth Circuit stated "[i]t is one thing to insure all risk of power outage losses at known, identified Pentair facilities caused by covered damage to off-premises power suppliers," but "[e]xtending that coverage to Pentair losses resulting from power outages at unknown third-party supplier premises, which may be located all over the world, insures a different and presumably more substantial risk." *Id*. at 617-18. The Eighth Circuit thus concluded that the contingent business interruption loss in question was not sufficiently "direct" to be covered by the policy at issue.

Like *Source Food* and *Pentair*, *Great Plains Ventures, Inc. v. Liberty Mut. Fire Ins. Co.*, 161 F. Supp. 3d 970 (D. Kan. 2016), also does not stand for the proposition that "physical loss" requires "actual, tangible, permanent, physical alteration of property." In *Great Plains Ventures* (yet another summary-judgment stage case), the plaintiff relied on *Advance Cable Co., LLC v. Cincinnati Ins. Co.*, No. 13-CV-229-WMC, 2014 WL 975580 (W.D. Wis. Mar. 12, 2014), to argue that minor blemishes and cosmetic dents on its roof caused by hail were covered losses. The court

9

noted that, unlike the Cincinnati policy at issue in *Advance Cable*, the instant policy did "not define 'loss' as 'loss or damage,' and the word 'damage' is not included at all in the 'Coverages' section." 161 F. Supp. 3d at 978. Nonetheless, the court found *Advance Cable* persuasive and found that coverage existed. Cincinnati claims that *Great Plains Ventures* "holds that the phrase 'physical loss or damage' 'unambiguously' requires physical alteration of property," Motion at 15, but that distorts the opinion and its consideration of *Advance Cable*, which involved a Cincinnati policy similar to that here that defined loss to include ***both*** "physical loss or damage." Here is the *Great Plains Ventures* court's full reasoning:

> The distinction that Defendant draws between the language of this Policy and that in *Advance Cable* does not require the Court to ignore the interpretation of the phrase "loss or damage" in that case. Looking beyond *Advance Cable*, the phrase "physical damage" in an insurance policy is widely accepted to mean a "physical alteration." Thus, the Co (urt finds that the phrase "physical loss or damage" provides coverage where, as here, cosmetic hail dents physically alter an insured's property.

161 F. Supp. 3d at 978. If Plaintiffs' policies only provided coverage in the event of "physical damage," Cincinnati's argument might have force, but the policies here define loss to include "physical loss" ***or*** "physical damage." And as the court reasoned in *Advance Cable* (involving a Cincinnati policy), "where [an] insurance policy explicitly covered physical loss ***and*** physical damage, "'direct physical loss' must mean something other than 'direct physical damage,' since otherwise [the] policy language would be rendered superfluous." 2014 WL 975580, at *10 (emphasis in original) (quoting *Manpower Inc.*, 2009 WL 3738099, at *5).

In short, although Cincinnati boldly states that "American case law is overwhelmingly consistent" with its position that coverage for direct physical loss should be precluded in the

absence of "actual, tangible, permanent, physical alteration" of the insured's property,[8] the majority of courts to analyze this issue have held the opposite. And Cincinnati ignores that the cited cases involved determinations about policy language made at the summary judgment stage.

### 3. Federal courts applying Missouri substantive law have not required physical alteration of property to find physical loss or damage

State law governs the interpretation of the insurance policies. *Secura Ins. v. Horizon Plumbing, Inc*., 670 F.3d 857, 861 (8th Cir. 2012). Plaintiffs are not aware of any court in Missouri requiring physical ***alteration*** of property for an insured to sustain physical loss to property. To the contrary, courts applying Missouri law have concluded that actual physical damage is ***not*** required for an insured to recover for "physical loss" to its property. In *Hampton Foods, Inc., v. Aetna Cas. & Sur. Co*., the Eighth Circuit examined language in a personal property policy insuring a grocery store (Hampton Foods) against "'loss of or damage to the property insured . . . resulting from all risks of direct physical loss' and covering loss of certain earnings and expenses under what is generally known as business interruption coverage." 787 F.2d 349, 351(8th Cir. 1986) (applying Missouri law). The insured's building in that case evidenced signs that it was in danger of collapse, and the building owner forced Hampton Foods to evacuate. *Id*. Hampton Foods had significant losses from the salvage sale of its inventory and the complete loss of business equipment. *Id*. Aetna denied coverage, arguing that the policy language required a "direct physical loss," while Hampton

---

[8] Defendant's citation to *Crestview Country Club, Inc. v. St. Paul Guardian Ins. Co*., 321 F. Supp. 2d 260, 264 (D. Mass. 2004) for this proposition is similarly misplaced. Motion at 17. In ruling on motions for summary judgment, the *Crestview* court concluded an insurance policy that insured a golf course for up to $500 for tree, plant, or shrub removal did not cover the cost of the re-design of the thirteenth hole of the golf course after a storm necessitated removal of the tree. Acknowledging that another Massachusetts case, *Matzner v. Seaco Ins. Co.*, 1998 WL 566658 (Mass. Super. Aug. 12, 1998), found that "direct physical loss or damage" could exist even without physical damage to a structure, the court in *Crestview* concluded that pursuant to the Defendant's policy sublimit for "tree, plant, or shrub" damage and removal, the Plaintiff's claim was satisfied after the insurer paid the cost of damage to the tree. 321 F. Supp. 2d at 265.

Foods argued that the policy only required "damage or loss resulting from the risk of direct physical loss." *Id*. The trial court granted summary judgment to Hampton Foods, finding that "the commonsense meaning of [the policy provision] is that any loss or damage due to the danger of direct physical loss is covered. Hampton's inventory suffered a loss because of a danger of direct physical loss." *Id*. at 352. The Eighth Circuit affirmed, upholding the trial court's finding that the language of the policy was ambiguous and must be construed in favor of the insured. *Id*. (citing *Heshion Motors v. Western Int'l Hotels*, 600 S.W.2d 526, 537 (Mo. App. 1980).

In *Mehl v. The Travelers Home & Marine Ins. Co*., the court found that where the phrase "direct physical loss" was not defined in a Missouri property insurance policy, "to construe the term 'direct physical loss' as requiring damage not defined in the policy leads to ambiguity in the policy." *See* **Ex. 1** at 2 (citing *Cincinnati Ins. Co. v. German St. Vincent Orphan Ass'n, Inc*., 54 S.W.3d 661, 668 (Mo. App. 2001). The plaintiff in *Mehl* learned that his home was infested with brown recluse spiders after moving into the house. He argued the property was uninhabitable as a result of the spider infestation and filed a claim with his homeowners policy for loss of use of the property. Defendant denied the claim, arguing there was no "direct physical loss" to the property because the parties agreed that "the residence suffered no 'physical damage' on account of the spiders . . .." *Id*. The court declined to adopt the insurer's suggested meaning and instead adopted "construction of the policy that is most favorable to the insured." *Id*. (citation omitted).

The court's analysis in *Mehl* is consistent with that of several other courts examining the meaning of "physical loss" or "physical damage" in an insurance policy. *See, e.g*., *W. Fire Ins. Co. v. First Presbyterian Church*, 437 P.2d 52 (Colo. 1968) (holding the loss of use of church, rendered uninhabitable by gasoline vapors, constituted a direct physical loss). These courts have held that a physical loss or damage to an insured's premises may occur ***without*** physical alteration.

12

It is enough that there has been a loss of use of the premises. *See, e.g.*, *Motorist Mut. Ins Co. v. Hardinger*, 131 F. Appx. 823, 826 (3d Cir. 2005) ("direct physical loss or damage" requirement satisfied by e-coli, which had "reduced the ***use*** of the property to a substantial degree") (emphasis added); *Port Authority of New York & New Jersey v. Affiliated FM Ins. Co.*, 311 F.3d 226, 236 (3rd Cir. 2002).

Indeed, courts have observed that the majority of cases nationwide find that physical damage to property is ***not*** necessary where the property has been rendered unusable by a covered cause of loss. *See, e.g.*, *Travco Ins. Co. v. Ward*, 715 F. Supp. 2d 699, 708 (E.D. Va. 2010); *Murray v. State Farm & Cas. Co.*, 509 S.E.2d 1, 17 (W. Va. 1998) ("'Direct physical loss' also may exist in the absence of structural damage to the insured property," as "[l]osses . . . rendering the insured property ***unusable*** or uninhabitable, may exist in the absence of structural damage to the insured property") (emphasis added); *Sentinel Mgmt. Co. v. New Hampshire Ins. Co.*, 563 N.W.2d 296, 300 (Minn. App. 1997) ("Direct physical loss may exist in the absence of structural damage to the insured property. . .. Although asbestos contamination does not result in tangible injury to the physical structure of a building, a building's function may be seriously impaired or destroyed and the property rendered useless by the presence of contaminants") (emphasis added); *Matzner v. Seaco Ins. Co.*, No. 96-0498-B, 1998 WL 566658, at *3 (Mass. Super. Ct. August 12, 1998) ("[T]he phrase 'direct physical loss or damage' ***is*** ambiguous in that it is susceptible of at least two different interpretations. One includes only tangible damage to the structure of insured property. The second includes a wider array of losses.") (emphasis in original); *Prudential Prop. & Cas. Ins. Co. v. Lillard-Roberts*, No. CV-01-1362-ST, 2002 WL 31495830, at *28 (D. Or. June 18, 2002). This conclusion makes sense because:

> To accept [the insurance company's] interpretation of its policy
> would be to conclude that a building which has been overturned or

> which has been placed in such position as to overhang a steep cliff has not been "damaged" so long as its paint remains intact and its walls adhere to one another. Despite the fact that a "dwelling building" might be rendered completely useless to its owners, [the insurer] would deny that any loss or damage had occurred unless some tangible injury to the physical structure itself could be detected. ***Common sense requires that a policy should not be so interpreted in the absence of a provision specifically limiting coverage in this manner.***

*Hughes v. Potomac Ins. Co.*, 18 Cal. Rptr. 650, 655 (Cal. Dist. Ct. App. 1962) (emphasis added), *disapproved on other grounds*, *Sabella v. Wisler*, 27 Cal. Rptr. 689 (Cal. 1963).

For example, a dine-in restaurant's intended purposes include providing a safe environment for its occupants to eat and drink, and the use and enjoyment of that property by its customers without being placed in a dangerous situation. Similarly, a hair salon's intended purpose includes providing a safe environment for its patrons to obtain hair styling and other services. The inability to use the property or a portion of the property for its intended use therefore constitutes a direct physical loss.

COVID-19 is inherently noxious, and its presence, presumed presence, or imminently threatened presence rendered Plaintiffs' properties unusable or unsafe for their intended purpose. *See, e.g., Lillard-Roberts*, 2002 WL 31495830, at *29 ("Although the mere adherence of molecules to porous surfaces, without more, is not physical loss or damage, this case involves more, namely the inability … to enjoy the personal property because of the mold spores adhering to it."); *Cooper & Olive Indus. v. Travelers Indem. Co.*, No. C-01-2400, 2002 WL 32775680, at *5 (N.D. Cal. Nov. 4, 2002) (policyholder could claim business income and losses from contamination of well with *E. coli* bacteria). Plaintiffs' allegations plainly state plausible claims for relief, and Cincinnati's Motion should be denied.

14

### 4. Even *temporary* contamination or *suspected* contamination can cause "physical loss or damage"

Cincinnati next appears to suggest that because Coronavirus might be removed by cleaning with appropriate products, and therefore "removed" in theory, there can be no "physical loss." Motion at 19. Even where a loss is temporary, however, or the reduction in a property's utility is only partial, physical loss or damage can still exist if the property is unsuitable for its intended use. For example, in *Gregory Packaging, Inc. v. Travelers Prop. Cas.*, No. 2:12-cv-04418, 2014 WL 6675934 (D. N.J. Nov. 25, 2014), the insurance company argued that a manufacturing plant that was evacuated after the release of ammonia suffered no physical loss or damage because the ammonia was remediated within a week. *Id.* at *2. The court rejected this argument, ruling "the property can sustain physical loss or damage without experiencing structural alteration," and there was physical loss or damage to the plant from ammonia because "the heightened ammonia levels rendered the facility unfit for occupancy until the ammonia could be dissipated." *Id.* at *5–6.

Suspected contamination of property by the novel coronavirus is enough to damage insured property. As has recently been noted, the enforcement of social distancing to suppress transmission of the disease is currently the only proven mitigation tool, with the virus spreading because of person-to-person contact, via contact with surfaces, and remaining in the air within confined areas. *See, e.g.*, *Friends of Danny DeVito v. Wolf*, 227 A.3d 872, 891 (Pa. 2020). There is no commercial method to test for the presence of COVID-19 on property. Many individuals—particularly the young—who are infected with COVID-19 are asymptomatic. Yet they are still able to transmit the virus. It is therefore statistically likely that the virus was, and continues to be, present in properties frequented by large numbers of people. Physical loss or damage should therefore be presumed, particularly at the stage of a motion to dismiss.

15

## 5. The development of an industry standard exclusion language related to disease-causing bacterial or viral infections shows that Cincinnati knew or should have known that its policies provided coverage in situations where physical loss occurred without physical alteration

Insurers like Cincinnati are well aware that viruses can cause physical loss or damage, as evidenced by the creation of a virus exclusion endorsement following the SARS pandemic in the early 2000s by the Insurance Services Office ("ISO"), an organization that develops standard forms for the insurance industry, collects statistical data, and estimates risks relevant to the form. *See* Compl. ¶¶ 13, 26–28, 35–37. While putting such an exclusion in a policy does not necessarily preclude coverage, the failure to include such an exclusion here undermines Cincinnati's attempt to re-write its existing policies, post-loss, to deny claims involving viruses. Plaintiffs' allegations about the insurance industry's response to prior pandemics, including the development of a proposed standard "amendatory endorsement" to exclude loss due to virus or bacteria, *id.* ¶¶ 35–37, further support Plaintiffs' interpretation and claim that viruses are covered causes of loss that can cause "physical loss" or "physical damage" under Cincinnati's policies.

### B. Civil Authority coverage is plausibly alleged

Cincinnati raises two challenges to Plaintiffs' claims based on Civil Authority coverage, Motion at 20–23, but as with its other arguments, Cincinnati relies on ***summary-judgment-stage*** cases, and the Court should deny the Motion as it relates to Civil Authority coverage.

First, Cincinnati notes that Civil Authority coverage applies in situations where "a Covered Cause of Loss" occurs to "property other than the Plaintiffs' property." Motion at 20–21.[9] Cincinnati then essentially repeats its earlier argument, contending that "[j]ust as the Coronavirus is not causing direct physical loss to Plaintiffs' premises, it is not causing direct physical loss to

_____

[9] Each of the four cases that Cincinnati cites in the first paragraph of Page 21 in its Motion involved a motion for summary judgment.

other property." Motion at 21. Accordingly, the Court should reject Cincinnati's first challenge for the same reasons set forth above.

Second, Cincinnati argues that stating a claim for Civil Authority coverage "requires that access to Plaintiffs' premises be prohibited by an order of Civil Authority." Motion at 22.[10] Cincinnati then mischaracterizes Plaintiffs' allegations and the referenced Civil Authority orders to contend that Plaintiffs' "allegations establish access [to their businesses] was **not** prohibited" (emphasis added), thereby purportedly rendering Civil Authority coverage inapplicable. Motion at 22–23. This is wrong in several respects.

To start, Cincinnati claims "Plaintiffs concede that the Closure Orders did not prohibit access to salon premises," such as the business locations of Plaintiff Studio 417. Motion at 22 (citing Compl. ¶ 67). That grossly mischaracterizes the cited paragraph from Plaintiffs' Complaint:

> 67.    On March 24, 2020, Mayor McClure issued a Second Proclamation of Civil Emergency. On this date, he also provided notice of a civil authority order requiring all individuals to stay at home unless performing "essential activities," and ordered all businesses to cease all in-person operations unless declared an "essential business." The order required hair salons and all other businesses that provide personal services to suspend operations. The order was to take effect at 12:01 a.m. on March 26, 2020 and expire in 30 days. The purpose of the order was to mitigate and slow the spread of COVID-19 in the community.

Plaintiffs clearly allege that the Closure Orders required hair salons — which were **not** categorized as an "essential business"— "to cease all in-person operations," while also ordering all individuals to stay at home unless performing essential activities. In tandem, these directives plainly prohibited access to salon premises.

---

[10] Notably, Cincinnati **again** relies on cases involving summary judgment motions, as every case cited on Pages 22 and 23 of its Motion involved a motion for summary judgment.

As to the restaurant Plaintiffs, Cincinnati ignores Plaintiffs' allegations that the Closure Orders dictated, among other things, "that all inside seating is prohibited at restaurants," that "all restaurants [were required] to suspend operations except for providing delivery or carry out only," and that "every person in the State of Missouri shall avoid eating or drinking at restaurants," with limited exceptions for "the use of drive-thru, pickup, or delivery options." Compl. ¶¶ 71–80. Despite these broad directives prohibiting customers from access to the interiors of restaurant premises, Cincinnati contends that because "the Closure Orders allowed restaurant premises to remain open for food preparation, take-out, and delivery," then all "access to restaurant premises was not prohibited." Motion at 22, 23.

Cincinnati's attempt to re-write the policy language also shows that the phrase "prohibits access" is ambiguous, as Cincinnati treats the policies as providing coverage only when **all** or **complete** access to the premises is prohibited by Civil Authority. The specific language, however, provides coverage for "actual loss of 'Business Income' . . . caused by action of civil authority that prohibits access to the 'premises,'" which the Policies define to include buildings. *See* Doc 1-1 at 38. The policies could have, but did not, use language such as "prohibits all access" or "prohibits any access" to the premises. Here, the Closure Orders clearly prohibited access to Plaintiffs' premises for all customers because they were prohibited from entering Plaintiffs' premises.

The case law, including cases that Cincinnati cites, support denying the Motion due to a purported lack of a prohibition on access. For example, Cincinnati cites *Southern Hospitality, Inc. v. Zurich Am. Ins. Co.*, 393 F.3d 1137 (10th Cir. 2004), and *TMC Stores, Inc. v. Federated Mut. Ins. Co.*, 2005 WL 1331700 (Minn. Ct. App. June 7, 2005), Motion at 22–23, but the reasoning in those cases supports Plaintiffs. The plaintiff in *Southern Hospitality* operated hotels, and the Civil Authority action at issue was an FAA order that "stopped airplanes from flying; it did not close

18

hotels." 393 F.3d at 1141. The Tenth Circuit contrasted those facts to cases that "found that access was prohibited where the order of a civil authority **required the insured's premises to close**, thereby invoking coverage for business losses." *Id.* (citing cases and emphasis added). The Tenth Circuit also concluded that Civil Authority coverage did not exist in that case "because the FAA's order grounding flights did not itself prevent, bar, or hinder access to [plaintiff's] hotels in a manner contemplated by the policies." *Id.* Here, however, Plaintiffs allege the Closure Orders **did** require hair salons to close, which *Southern Hospitality* recognized as sufficient to "invoke[e] coverage for business losses" under Civil Authority coverage. And Plaintiffs' allegations also show that the Closure Orders did "prevent, bar, or hinder access to" Plaintiffs' restaurants by customers, who were prohibited from accessing restaurant premises for indoor dining, which is the essence of Plaintiffs' business operations.

The reasoning in *TMC Stores* similarly supports Plaintiff. That case involved disruption to the business of a garden and pet retail store caused by nearby construction that reduced previously available parking for the business, which remained open throughout the construction. 2005 WL 1331700, at *1. The court noted the plaintiff's argument that "the phrase 'prohibits access' was not defined in the policy" and that this ambiguity "requires a **factual determination of whether its customers' access** to the store was prohibited by th[e] construction." 2005 WL 1331700, at *4 (emphasis added). But on that particular factual record, where it was "undisputed that [plaintiff's] store remained open throughout the construction and that customers were able to enter the store even though ease of access was diminished," the court granted summary judgment in favor of the insurer. *Id.* The court also noted, however, that if "the record demonstrated a virtual economic shutdown of [plaintiff's] business, this would be a more difficult case." *Id.* Here, the Closure Orders required a total economic shutdown of hair salons, and Plaintiffs' allegations about the

19

sharply reduced scope of allowed restaurant activities suffice to state viable claims that the Closure Orders amounted to imposing "a virtual economic shutdown" on them to invoke Civil Authority coverage.

Cincinnati's other cases (which again are *all* summary judgment cases) also miss the mark, as their facts merely involved situations where the Civil Authority action at issue rendered it more difficult for customers to access a business. *See* Motion at 22–23. But that is not the situation here. And Cincinnati's final argument — that certain Closure Orders contained narrowly drawn exceptions to the stay-at-home directives, permitting limited access by *owners or employees* to non-essential business premises (like Studio 417's hair salon) for purposes such as "facilitat[ing] employees' ability to work remotely," Motion at 23 — ignores that the proper inquiry for this business interruption coverage involves "a factual determination of whether [Plaintiffs'] *customers'* access" to the premises was prohibited, circumstances which Plaintiffs' allegations show did occur here. *TMC Stores*, 2005 WL 1331700, at *4 (emphasis added).

### C. Ingress and Egress coverage is plausibly alleged

Cincinnati's policies provide for Ingress and Egress Coverage as follows:

> We will pay for the actual loss of "Business Income" you sustain and necessary Extra Expense you sustain caused by the prevention of existing ingress or egress at a "premises" shown in the Declarations due to direct "loss" by a Covered Cause of Loss at a location contiguous to such "premises." However, coverage does not apply if ingress or egress from the "premises" is prohibited by civil authority.

*See, e.g.,* Doc. 1-1 at 95. Cincinnati argues such coverage cannot apply because there is no direct physical loss. Motion at 24. However, as detailed above, this argument fails and is not supported by the cases, nor is it an appropriate determination to make on a motion to dismiss. The policy language at issue is ambiguous, as the phrase can reasonably be interpreted in multiple ways, with no definition of "physical loss" or "physical damage" provided anywhere in the policies.

20

Additionally, the policy language does not require physical alteration for there to be direct physical loss, and courts addressing similar ingress and egress coverage have not required such to find physical loss.

In *Fountain Powerboat Indus., Inc. v. Reliance Ins. Co.*, 119 F. Supp. 2d 552 (E.D.N.C. 2000), the court examined whether the closure of an access road to insured's facility following a hurricane triggered coverage under an ingress and egress clause, even though the interruption there was not caused by physical damage to the insured's property:

> The court cannot find, and neither party has provided, any case in any jurisdiction that interprets an ingress/egress clause contained in the business interruption loss section of an insurance policy. The court believes that this is due to the fact the meaning of the clause is exceedingly clear. ***Loss sustained due to the inability to access the Fountain facility and resulting from a hurricane is a covered event <u>with no physical damage to the property required</u>***.

*Id.* at 556-57 (emphasis added). Further, the *Fountain* court recognized that coverage should be afforded if there was an interference with reasonable access to the facility, even if extraordinary means could lead to access. *Id.* at 557 n.4 ("The efforts of Fountain to pick up employees and drive them to work are extraordinary. The court finds that the ***ingress/egress provision relates only to reasonable access*** to the Fountain facility and does not therefore apply to extraordinary efforts by Fountain or its employees to get to work over closed and flooded roads.") (emphasis added).

While Cincinnati correctly notes that ingress and egress coverage does not apply in the policies at issue if it occurs as the direct result of Civil Authority prohibition, Plaintiffs have properly alleged that the presence of COVID-19 within Plaintiffs' respective establishments rendered the premises unsafe for human ingress and egress ***regardless of (and in addition to) any prohibition set forth by civil authority***. *See* Compl. ¶¶ 14, 58, and 63 ("Plaintiffs were forced to suspend or reduce business at their covered premises ***due to COVID-19 <u>and</u> the ensuing orders***

issued by civil authorities…."); ("The presence of people infected with or carrying COVID-19 particles *renders physical property in their vicinity unsafe and unusable*, resulting in direct physical loss to the property."); ("The COVID-19 pandemic is a public health crisis that has profoundly impacted American society, including the public's ability to patronize hair salons, barber shops, restaurants, bars and other establishments.") (emphasis added). In other words, as alleged, the presence of COVID-19 within the Plaintiffs' establishments, and the community at large, caused the resulting prevention of ingress and egress at each premises. The fact that Civil Authority actions also denied ingress and egress is irrelevant where the necessary and sufficient conditions for coverage had already been met.

### D. Dependent Property Coverage is plausibly alleged

Cincinnati next argues there can be no Dependent Property coverage because such coverage requires "both a direct physical loss to dependent property and a necessary suspension of the insured's business as a result of that direct physical loss." Motion at 24. Under the policies, "dependent property" includes property operated by others whom the insured depends on to deliver material services to it, *accept its products or services*, manufacture products for delivery to its customers, *or attract customers to its business*. *See*, *e.g.,* Doc. 1-1 at 64. Once more, the crux of Cincinnati's argument is the incorrect interpretation of "physical loss." However, as to the policies' requirement that direct physical loss occur to "dependent property," Plaintiffs have sufficiently demonstrated that the presence of COVID-19 throughout the community at large in the Springfield and Kansas City metropolitan areas resulted in direct physical loss to property relied upon by Plaintiffs to maintain their respective business operations. *See* Compl. ¶¶ 50, 55 ("COVID-19 infections are spread through droplets of different sized which can be deposited on surfaces or objects."); ("The presence of any COVID-19 particles renders items of physical

property unsafe and the premises unsafe."); ("The presence of people infected with or carrying COVID-19 particles renders physical property in their vicinity unsafe and unusable, resulting in direct physical loss to that property."). In short, the presence of COVID-19 particles amongst Plaintiffs' communities, including both property/surfaces throughout the communities and people within the communities, is a direct physical loss of dependent property on which Plaintiffs' businesses rely.

As detailed in Plaintiffs' Complaint, the Closure Orders that mandated, among other things, a limit on public gatherings, required citizens to stay home unless performing "essential activities," and required businesses to suspend operation unless declared an "essential business" proximately resulted in Plaintiffs' lack of customers to accept their respective products and/or services and a lack of attraction to Plaintiffs' businesses. *See* Compl. ¶¶ 65–96. Plaintiffs' loss of busines income deriving from direct physical loss of property within their communities is properly pleaded as Dependent Property Coverage pursuant to the policies, and Cincinnati's Motion to Dismiss this claim of coverage must be denied.

### E. Sue and Labor Coverage is plausibly alleged

Finally, Cincinnati contends that the policies provide no coverage for prevention of loss, commonly referred to as Sue and Labor coverage. Instead, Cincinnati argues that the policies simply impose a duty on the insured to prevent further damage to the extent reasonably possible in the event of a Covered Cause of Loss. Cincinnati admits Plaintiffs would be entitled to recover expenses in such circumstances, but denies that there is a covered loss triggering the recovery of expenses. Motion at 25.

Contrary to Cincinnati's argument, Plaintiffs' allegations show the "Preservation of Property Clause" clause in the policies should be regarded as a distinct type of coverage

supplementing the policies. The clause is clearly designed to protect the insurer's interest by reducing and mitigating the risk of damage from a covered loss, and Eighth Circuit case law supports Plaintiffs' position. *See Assicurazioni Generali S.P.A. v. Black & Veatch Corp.*, 362 F.3d 1108 (8th Cir. 2004). In that case, after storm damage to construction equipment, plaintiff brought a claim for consequential damages and the expenses incurred to avoid delay on a project. In finding plaintiff was entitled to reimbursement of such expenses, the court stated: "We are hard pressed to see how the [insurer] reasonably can claim that [Plaintiff] had no duty to minimize losses under the policy that it procured, and instead should have left the [insurer] with even greater losses to pay." 362 F.3d at 1116.

Regardless of Cincinnati's semantics in characterizing the policies' Preservation of Property Clause, there appears to be no dispute that Plaintiffs are entitled to recover costs in preventing further loss should a Covered Cause of Loss be established. As detailed throughout Plaintiffs' Complaint, and as explained throughout these Suggestions in Opposition, Plaintiffs' allegations properly state plausible and cognizable claims for coverage under numerous clauses within the policies. And Plaintiffs undertook reasonable measures in closing their respective businesses to prevent the further spread and prolonging of the virus within their properties. *See* Compl. ¶ 250 ("In complying with the Closure Orders and otherwise suspending or limiting operations, Plaintiffs and other members of the Sue and Labor Breach Class incurred expenses in connection with reasonable steps to protect Covered Property."). As such, the Court should deny the Motion to Dismiss Plaintiffs' claim for Sue-and Labor Coverage under the policies.

## IV.     <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the Motion to Dismiss in its entirety.

Dated: July 20, 2020

Respectfully submitted by:

BOULWARE LAW LLC

*/s/ Brandon J.B. Boulware*

| Brandon J.B. Boulware | MO # 54150 |
| Jeremy M. Suhr | MO # 60075 |

1600 Genessee Street, Suite 416
Kansas City, MO 64102
Tele:   (816) 492-2826
Fax:    (816) 492-2826
brandon@boulware-law.com
jeremy@boulware-law.com

VOTAVA NANTZ & JOHNSON, LLC

BY:  */s/ Todd Johnson*

TODD JOHNSON            MO #48824
9237 Ward Parkway, Suite 240
Kansas City, MO 64114
Tele:   (816) 895-8800
Fax:    (816) 895-8801
tjohnson@vnjlaw.com

WAGSTAFF & CARTMELL LLP

*/s/ Thomas A. Rottinghaus*

| Thomas A. Rottinghaus | MO # 50106 |
| Tyler W. Hudson | MO # 53585 |
| Jack T. Hyde | MO # 63903 |

4740 Grand Avenue, Suite 300
Kansas City, MO 64112
(816) 701-1100 (telephone)
(816) 531-2372 (facsimile)
trottinghaus@wcllp.com
thudson@wcllp.com
jhyde@wcllp.com

***Attorneys for Plaintiffs***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 20th day of July 2020, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to counsel of record for this case.

 /s/ Brandon J.B. Boulware
*Attorney for Plaintiffs*

26